and we should have Janelle Freeman for the appellant and Christine Kovach for the athlete. Once you're prepared to proceed, you may proceed Ms. Freeman. May it please the court, opposing counsel, my name is Janelle Freeman and I'm here on behalf of the appellant Michelle Capelle in this matter. We're here before the court on a dissolution of marriage case that was heard in September of 2017 and the final order was entered on October 3rd. There are several issues that we've appealed in this matter and I'd like to briefly go through some of the facts that I think are relevant to the arguments you're going to hear today. The parties were married in August of 1991 and by the time of filing the petition they had been married almost 25 years. There were four children born during the marriage, two of whom had reached the age of majority by the time of the final hearing and two of whom were minors at the time. Both of the minor boys have some behavioral problems, both have been diagnosed with ADHD, ADD and specifically those problems lead to issues with the kids' schooling. They have some extra assistance regarding their schooling, they have difficulty staying on task. There was multiple testimony that they needed just a little extra supervision to make sure that they could succeed in school. And the testimony presented in the GAO even found that throughout both the marriage and party separation, mother for lack of a better word or definition was the more on task parent with the children. She provided more of the structure to the children's lives. She got them after school every day, she was making sure homework was getting done. She was the parent that was going onto the school website and making sure that the assignments the boys said were due were the ones that were actually due and that they weren't fitting to her on what needed to be done that night. In addition, there was testimony that throughout the marriage and during the separation, she was also the parent that kind of provided more day-to-day caretaking functions of the children. Getting them to the doctors, again making sure when they got home from school they were fed, those kinds of things. Now some of that, especially later in the marriage was due to the fact that Michelle became unemployed due to a disability. At the time of the hearing, Mr. Capel was working for WA Architects making in excess of $89,000 a year. And Michelle was receiving a long-term disability policy making slightly in excess of $22,000 a year. She was also applying for social security disability and that was still pending at the time of the trial. When Michelle became disabled, the parties found themselves unable to pay their monthly expenses because their income had been reduced. At that time, they began borrowing money from Michelle's father, Thomas Korty. Now that's one of the main issues in this appeal is the trial court in its final order found that the money from Mr. Korty was a gift and not a loan. Now the trial court in its final order focused on this Exhibit 8. And Exhibit 8 was a document that both parties had signed during the separation, but I believe it was prior to the actual petition for dissolution being filed, that before they did evidence the amounts that had been borrowed from Mr. Korty. Counsel, as I recall, the argument was that, opposing counsel, that this document was presented during settlement conference. It was, I believe it was during a counseling, like a marriage counseling session. Yes. That was part of their argument and that I think may be why the court said it's not an enforceable contract. But argument is that's not the only thing the court should have looked at when determining whether this was a gift versus a loan. That the law in Illinois is that the presumption is when a parent gives property to a child that it is a gift, but that that presumption can be overcome by clear and convincing evidence. Now certainly a promissory note or repayment plan would overcome that presumption, but there's also case law that says testimony regarding the party's intent to repay the loan is sufficient to overcome the presumption of a gift. And that's what we have in this case. Is that both parties during their testimony stated that they understood that when Ms. Capel received her back pay award from Social Security, Mr. Cordy was going to be paid back. That was the respondent's testimony. He has a vested interest in the trial court finding that this was a gift, but his own testimony was that there was an understanding that it would be repaid. Argument is the trial court was wrong in error saying that because Exhibit 8 wasn't an enforceable contract, that's why it was a gift. We believe the trial court failed to look at all of the evidence in front of it at the time. And so we would ask the court to remand that issue and construct the mandate that the trial court allocated the debt pursuant to 503. Now the next issue I'd like to go through is that of the denial of Michelle's request for the right of first refusal. When the legislature modified the IMDMA back in 2016, they specifically added Section 602.3 regarding the right of first refusal. And the trial court may grant the right of first refusal if it finds it's in the best interest of the children to do so. I think this is one of the more interesting cases in front of the court today because there are no cases in Illinois that provide us guidance on whether it is proper or improper for the court to grant such the right. If you look at the facts of this case, I believe this is the exact type of case the legislature had in mind when adding the statute. In this matter, Michelle, and there's multiple testimonies, she gets the kids every day during Bruce's parenting time while he's at work and keeps the children until he gets off work between 630 and 7 o'clock at night during the summer. So if there's no school, she has them throughout the day. Interestingly enough, both the GAO's justification and the court's justification for not granting the right of first refusal is that the parties do it anyway so it doesn't need to be in the order. And although I appreciate the logic of that, being in family law and practicing in family law, we often know that logic is exactly how we end up back in court on post-trial motions. Because even if parties have been doing something for years, and even if they promise to continue to do so, if it's once the final ink on the final order dries, oftentimes it stops happening. And again, the logic is why we end up back in court. Now there is one case that's akin to the right of first refusal. It's regarding parenting time, and that's in the marriage of Dobby. In that case, the father was a barge worker, so he was gone for approximately two months at a time, and then he would be home for 20 days. And after a hearing, the trial court granted that father every weekend visitation when he was home. He had requested that he be allowed to have the child while the mother was at work instead of a daycare provider. And the trial court actually found that that made sense, that if there was a parent available to care for the child, that it was always in the child's best interest to be with that parent versus a daycare provider. And that's the situation we have here. That's the right of first refusal. So we believe it was an error for the trial court to deny Michelle's request to grant her the right of first refusal. Counsel? Yes. And I might agree that it's a good idea to have the right of first refusal. Yes. Okay, and these facts, it sounds like probably a good idea, but, I mean, is the standard review of use of discretion? Did the judge have some discretion whether or not to order it? Yes, absolutely, Your Honor. But I believe that is the standard. But I can't think of a case that's more fitting for this type of thing, because, like I said, it is. It's what the parties do. And when the rationale is they do it anyway, so we're not going to put it in the order, I think not putting it in the order is the abuse of discretion. So that's why we believe the trial court's error doesn't matter. Finally, because I know there's not a lot of time, there's one more area which, again, I don't believe there's a lot of case law on that the judge made a decision on, and that's the allocation of the contingent medical expenses. Now, again, the statute states that the court may do this, and it's in its discretion on how it allocates these contingent uninsured, uncovered medical expenses. And there's one existing case that basically just says that the trial court should consider the financial circumstances of the parties when allocating these expenses. It doesn't really give us any guidance as to what factors the court, regarding the financial circumstances, the court should be looking at. In this matter, we have one party whose gross income is more than three times that of the other party, before maintenance and child support are calculated and factored in. Even with the maintenance amount calculated in, Michelle's yearly income is about $43,000 gross, and Mr. Capel's yearly income is about $68,000. Now, that's not as bad as the initial $89,000 and $22,000, but there's still a pretty large disparity between their two incomes, yet the court chose to allocate these uninsured, uncovered expenses 50-fifth. We believe that given the difference in their incomes, that that equal distribution was an error and an abuse of the trial court's discretion. I know there were multiple other issues briefed in this, and I know I've just given you a limited time, and I don't know if Your Honor's had any questions about the remaining issues. No, I don't think we do. Thank you for your argument, and I look forward to the opportunity for rebuttal. Thank you, Your Honor. Ms. Kovach. May it please the Court, I'm Christine Kovach. I represent Bruce Capel, the appellee in this case, distinguished panel, guests, opposing counsel. This case, judges, started with an order of protection. Michelle Capel was mad because Bruce Capel was leaving roses on her pillow or candies in the bedroom or notes because he wanted the marriage to stay together. He did not want this divorce. Ms. Capel went out to the Internet, found a separation agreement, and in January or February of 2016, he agreed to this separation agreement because he wanted the marriage to stay together. He wanted to be together. And they started a bird nesting arrangement. He lived part-time in the house, she lived part-time in the house, and when they were not in the house, they each lived with their parents. They started initially with the marriage counseling. It then turned into divorce counseling. At a divorce counseling session on April 1, 2016, we first see Michelle's loan account, Exhibit J, or Exhibit 8 of the petitioner. There's testimony in the trial regarding if he had ever seen this document before that date, if he ever knew exact amounts that had been borrowed from the father. And, in fact, he testified that all of the discussions regarding the amounts from the father were between Michelle and the father. Bruce was not involved in those discussions. He acknowledges in trial that he was aware money was coming into the house. However, he also testifies that Michelle was handling the finances. She was getting the checkbook in order, she was paying the bills, and he was not part of those transactions. He was not aware of how much money was coming in. He also admits, as counsel points out, that the agreement that Michelle indicated to him was that she agreed to pay her dad back from her back pay award from her Social Security. As we know, Social Security back pay awards are not marital property. They cannot be divided. So Mr. Capel has no ability to either say or not say whether Mr. Cordy gets paid back from that back pay award. When and if she receives back pay, which that appeal, to my understanding, is still pending, she can pay him back, which is what her agreement was in the first place, to pay him back out of the back pay award. Additionally, the case law is fairly clear in this area. The testimony of a party at trial is speculative in this regard. De Blasio's case, which I cited in my brief, indicates that the court should, with skepticism, look at these alleged loans received from a parent to a child when there is a great disadvantage to the spouse who didn't get the money, that it be characterized as a loan and he then be required to pay it back. I believe that the trial court did not abuse its discretion in finding these payments as gifts. I believe that the testimony did not support a finding that they were not gifts. I would ask the court to uphold the trial court finding that they were gifts and that if Ms. Capel chooses to pay that money back out of her Social Security back pay award, it will be exactly what she had intended to do in the first place. With respect to the right of first refusal, I tried to think about this in terms of other laws that we have. We have a law that requires us to wear a seatbelt. How did that law come about? People weren't wearing their seatbelts. There were lots of studies that people wore seatbelts. There'd be less injuries to people and they'd continue. We have less tragic accidents, perhaps. So I thought, okay, right of first refusal came about because we had a number of cases, as this appellate court and the appellate courts throughout the state were seeing, parents were choosing not to let the other parent have a child when they needed a child care provider, they wanted to go out on a date, and the child was placed in child care, was placed with a parent, or a grandparent, not a parent. So what comes out of our legislative branch of our state is a right of first refusal statute to allow the courts to place in court orders a requirement that a parent place the child with the other parent if they are not available to watch the children. In this case, it's happening and it's still happening. In fact, as we stand here today on June the 7th, not one motion has been filed with the court in the trial court to ask for a right of first refusal because he failed to place the children with her, or to hold him in contempt, which would be inappropriate because there's no order for him to do that. However, he's doing it. He continues to do it. I think the trial judge saw that. I think the guardian ad litem saw that. Mr. Capel was very vested in the fact that these children should be with their mother when he's not available, as well as if she wasn't available, they should be with him. I see no reason to place in a court order a right of first refusal when the parties are already doing it. Well, I can see that. You could also say that maybe they're paying child support and it's the statutory amount. Maybe we shouldn't require that to be put in. I mean, you could say that about a lot of areas. It's fairly clear, at least with child support, that it is the trial judge's direct interest to ensure that that child's... In fact, that's one of the reasons at trial courts we are asked almost inevitably with settlement agreements, is there a provision, if there's children involved, is there a provision for child support? Trial judges take that very serious. I think, again, probably as we've seen, as the appellate courts have seen, the Supreme Court has seen, while there may be verbal agreements to do things, child support orders are required to be in writing. Verbal agreements, I don't recall the name of the case, but even modifications to child support are not enforceable. So on the right of first refusal, I'd ask the courts to find that the trial court did not abuse its discretion, and actually there's no need for it, and affirm the trial court. The allocation of uninsured expenses, again, abuse of discretion, difference in incomes. I would ask the courts if the court has not already looked at my Exhibit E, which was Respondent's Exhibit E. I pointed, in a demonstrative exhibit, I pointed out to the court, the trial court specifically, while when you look at gross incomes, mom's or wife's income is a third of dad's, when you break it all down, mom pays federal taxes and state taxes. That's it. Dad pays federal taxes, state taxes, Social Security, Medicare, health insurance, and City of St. Louis taxes, all before he gets down to a net, which is his disposable income. What he can spend are living expenses, groceries, utilities. When you do that, Exhibit E points out, and this one was based on the $2,000 payment. Arguably, there's a little bit of a difference because the trial court came in at about $1,800. She had 53% of what was left. He had 46%. She had more than half of the income that was left after paying all these required things to spend on her expenses. Most notably, the testimony in the transcript points out, she is renting a home in Highland. Her children live there with her. My client cannot afford to rent a home. They lived in a fairly, I wouldn't say it's a luxury house, it was a nice house, under-room $20,000, $30,000 house in Highland. Sell it. They pay their bills. She rents a home. He has to move in with Mom. To this day, he still lives with Mom. He can't afford to go out and maintain even the standard of living that they had during the marriage. He has had to take a much less standard of living to maintain his bills and keep the maintenance and child support paid. So the difference in incomes, I would argue, is not significant when you look at what they have to pay. The other thing, the Evanoff and Tomstick case, which I cited in my brief, the disparity in income was actually even greater in that case. The wife was the breadwinner in that case. She earned about $375,000 a year. The husband was not the breadwinner. He earned about $40,000. It was a 50-50 division on the allocation of uninsured medical and dental, and the appellate court affirmed that division, saying the trial court was in the best position to make that decision. With respect to the other issues that were briefed, the parenting plan judges, the trial court relied on the guardian ad litem report and the oral report in court, indicating that the essentially 50-50 schedule that they had was working, and it was working well. They had been doing it for approximately a year between the time the temporary order was entered and the trial court heard the final hearing in this case. The guardian ad litem, in fact, said that while mother offers her strengths, which are day-to-day tasks, keeping on task, father has strengths as well. Father is more equipped to deal with their emotional sides. Father has ADHD. Three of the four children have ADHD. There's only one child in this case who does not. Surprisingly, it's not in the transcripts, but was in before the court. These kids have done well. They did a fabulous job. The oldest child just graduated college. The second child is a sophomore at St. Louis University College, a university. The other two are grade school, but they're doing well. There's no testimony at trial court that the other two, Andrew and Benjamin's grades had suffered, that father had failed to do homework with them, that father had failed to provide for their needs. In fact, there was testimony by my clients. These kids are also active. Benjamin and Andrew play soccer. So soccer usually takes precedence all over the weekend. I said, well, when do you have time to sit down and have time with your children when you're not running? Sunday nights. Sunday nights is his wind-down time, have time with the kids, get them ready for school on Monday morning. So we'd ask that the parenting schedule not be changed. Interestingly enough, on that note, the parenting plan has not been entered by the trial court. You'll see some testimony in the transcript that the parties were to work together to get that parenting plan completed and submitted to the court, and we have been unable to accomplish that. Judge, I would argue with respect to the maintenances. I believe the court did follow the maintenance guidelines. The trial judge, Judge Mangarelli, attaches the formula right to the court order and how he calculated it. If there was error in the maintenance calculation, it was the trial court not considering the amount of gift income that the petitioner continues to receive from her father, which is substantial. Just comparing the two financial affidavits, the first one to the second one, and you average the – if you take the increase in the debt and you average it over the months, she's continuing to receive over $2,000 a month from her father every month, which was not included in her income in the calculation of maintenance. Disregarding completely. In relation to the child support issue, I would ask the court to – again, he did not deviate from guidelines. He followed guidelines, and I'd ask the court to affirm that as well. The last issue is the pension issue, Judge. Exhibit J, I believe, is the exhibit number, is the only document that the petitioner provided in discovery with respect to her pension. It is a letter from the pension people indicating that she does have a vested pension and there is a survivor benefit attached to that pension. I did not receive a pension plan document, so I ask the court to divide the pension equitably and to award my client's survivor spouse pension. As I stand here today, I can't tell you whether he's going to be eligible for that or not because I never received a plan document. The court ordered the surviving spouse. However, when it becomes retirement time, that may or may not be an item which he can get because I never got a plan document. So I ask the court to award it. The court awarded it. It is undisputed that the entire pension was during the marriage, and it was one of three retirement assets they had. Two IRAs and this pension was the only retirement assets they had and virtually the only assets to be divided at the trial. I'd ask the court to affirm everything that the trial court did. And the only caveat to that is if the court finds the maintenance was inappropriately calculated, I'd ask the court to review de novo as to whether that gift income should be included in the petitioner's gross monthly income in the calculation of maintenance. Thank you. Thank you, Ms. Kovach. Ms. Freeman, do you have a bottle? And, again, thank you. Regarding this gift versus debt issue, I think Ms. Kovach's argument is that Mr. Capel was essentially willfully ignorant in the amounts being borrowed from Mr. Forty, even though there's testimony that those amounts were going into the party's joint account. And so they're partially arguing that, well, he shouldn't be held responsible because he didn't know how much was being borrowed, so he shouldn't be held accountable for that. But at the same time, she wants you to find that even though he's willfully ignorant about what's being deposited into his joint account, he's supposed to know that Social Security back pays in non-marital assets. And that's not the test here. The test on whether this is a gift versus a debt was, is there evidence that the party intended to repay the amounts being given? That's clear. They even admitted it today that, yes, the understanding was the intention was to repay what Mr. Forty was given. That makes it a debt. That means that the court needed to find, allocate it, pursue it to 503. Counsel, what's the summary of the evidence that the husband agreed to this? Not just a, you know, your client did. Well, I mean, at the time they were getting the money, they were still together. It was being deposited into the joint account and used to pay their debt, their joint bills. It was being used to pay the household expenses. So I don't know if... What about that makes it a loan versus a gift? I don't necessarily think that's what makes it the loan versus the gift. Well, that's what I thought. I guess maybe I'm a little confused. I guess the question before this court, I guess, I'm not sure he had to,  and I guess if that's what I'm asking, it would be akin to like if one party signs up for a credit card during the marriage, it's still a marital debt even if the other party doesn't know that the credit card exists. In this situation, Mr. Capel acknowledged that he knew they were getting money from Mr. Forty. He just didn't. He's saying, I just didn't know how much it was because I wasn't paying attention. So I don't think he ever said, and then I knew we were going to pay it back out of Michelle's back pay award. So I think that's... The question is whether the presumption of a gift is overcome, and that's when we look at donative intent and was the intention of the donor for it to be a gift versus for it to be a loan. And this court, and I believe it's in the marriage of, and I might say this wrong, Wood Day, said that testimony from the parties that they intended to repay the money is sufficient to overcome the presumption. I don't know if that is where the money comes from that they intended to repay. In that case, there was no promissory note. There was no payment plan laid out on how repayments were going to be made. It was just, well, you know, Mom gave us this money, and we knew we were going to pay it back when we could. That's essentially exactly what we have here, which is both parties are saying, yeah, we were going to pay it back. It just happened they got divorced in the meantime between that, the money being borrowed and the money being paid back. And, again, I'm back on this right of first refusal because if it's not a problem, why is he so adamant that it not be contained in there? Because he's saying, well, you don't need to order me to do it because I'm going to do it anyway. He's under no obligation. And Ms. Kovacs is right. She has no remedy if he says, no, I'm not bringing the kids to you today. Well, let me ask you, if that was the only issue before the court, could you have appealed it? Could you have brought your appeal just based on that? Just based on the court's refusal to grant the right of first refusal? Yes. I don't think so. I mean, it's an abuse of discretion. I don't think this case, in any, before the court are the facts. And I think this is the situation that the legislature intended when it said we're going to include this because we do think this is important. And the question is, if it's not in there and he chooses to have it, let a third party watch the kids, he can do that at any time. But that's not. And then he can file a motion and make it an issue. Right, exactly. And she specifically requested it so it doesn't become an issue. So to real briefly touch on some of the other issues that she brought up, specifically regarding the pension, because I think this is their argument that this was, the pensions were really the only assets left. Thank you. You are out of time. Thank you both for your briefs and your arguments. Both take the matter under advisement, render a ruling in due course.